UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

<u>United States of America</u>,
    Government

    v.                                 Case No. 07-cr-144-01-SM
                                        Opinion No. 2008 DNH 059

<u>Richard Ellison</u>,
    Defendant

## **O R D E R**

Defendant, Richard Ellison, moved to suppress inculpatory statements he made to police officers during an interview at the Coos County House of Corrections (or jail) about his participation in two convenience store robberies that occurred in Concord about a year earlier. An evidentiary hearing was held, after which defendant was allowed to supplement his suppression motion to add a claim that police, or, more accurately, jail officials, failed to preserve a record of the interview generated by a security camera in the jail library. The motion to suppress (document no. 10) is necessarily denied.

### Background

On December 21, 2006, Berlin Police Detective Richard Plourde called Concord Police Detective Todd Flanagan. Plourde told Flanagan that he had interviewed Ellison at the jail in Coos

County in connection with an unrelated burglary investigation, and learned that Ellison had information about the earlier Concord robberies. Plourde summarized what Ellison had said and Flanagan determined that Ellison's information suggested that he had inside knowledge about the Concord robberies that was both accurate and of the type that "no one else would know about the cases."

Plourde told Flanagan that he had developed a rapport with Ellison and that Ellison had indicated a willingness to speak to the Concord police about the earlier robberies. The Concord robberies occurred within a few minutes of each other, and, each time, a woman entered the store with a firearm. Ellison was being held at the Coos County jail on charges of assaulting his former girlfriend, Robin Theriault, and he apparently told Plourde that Theriault was the woman involved in the robberies.

After checking some facts and reviewing pertinent investigative files, Flanagan went to Berlin, met Detective Plourde, and both officers went to the jail to interview Ellison. The interview took place in a room used as the jail library. Ellison was brought to the library in restraints. Detective Flanagan asked that the restraints be removed, which, after some

mechanical difficulty, they were. But, due to the mechanical problem with one handcuff, some delay was experienced. The jail guards finally had to use bolt cutters to remove it.

Defendant was not restrained when the interview began. The interview itself, but not preliminary discussions, was tape recorded. Defendant was calm, not surprised to see the officers, and seemed willing to talk. Flanagan explained that he was there to speak to Ellison about the Concord robberies. Defendant was also told that while no promises could be made to him, his cooperation would be brought to the attention of the prosecutor and the prosecutor would "determine how much weight to give it."

Ellison was not given <u>Miranda</u> warnings. But Ellison was told that he was not under arrest regarding the charges that Flanagan was there to talk about; that he was free to leave at any time; and that he did not have to answer any questions posed. Ellison consented to the interview and answered questions posed, implicating himself in the commission of the Concord robberies, for which he was later indicted.

At the time of the interview Ellison was also suspected of an unrelated possession of stolen property crime (a laptop

computer), and Flanagan told Ellison that he would try to help Ellison out with that likely charge — but that no promises could be made. Ellison told the detectives that he "didn't want to be charged" with the Concord robberies, but, again, neither Flanagan nor Plourde made any promise that Ellison would not be prosecuted based upon his own statements. Rather, Ellison was told that his cooperation would be made known to the prosecutor, who would "determine what happens."

Ellison testified at the suppression hearing. He said he understood Miranda's protections at the time of the interview, and confirmed that the warnings were not given. Ellison's version of the interview's preliminary exchanges differed markedly from Flanagan's. Ellison testified that he told the officers that he didn't want to be charged with the Concord robberies, and added that both Plourde and Flanagan repeatedly promised him that he would never be charged with those robberies, if the information he gave was truthful, and assuming he was not the "aggressor" in the robberies. And, Ellison claimed that he asked for legal counsel "at least five times." Ellison says that the officers' response to his requests for counsel "was different each time," but, essentially, the officers told him he "didn't need a lawyer because [he] wasn't being charged with a crime."

Ellison further testified that he spoke about the Concord robberies in the hope of resolving an unrelated burglary charge and a marijuana charge, as well as the laptop computer stolen property matter.  Ellison insisted that with respect to the Concord robberies he was told repeatedly that he was "not ever going to be charged with this," though the officers did say that he might have to be called as a witness.

### Discussion

At the hearing on November 27, 2007, the court found that the interview did not constitute a "custodial interrogation," in that Ellison was not "in custody" within the meaning of <u>Miranda</u>.  Ellison was being held on unrelated charges involving arson, he was interviewed not in his cell but in the library.  He was not in restraints, the officers were not armed, he was free not to answer questions, free to stop answering at any time, and free to leave (i.e., to leave the library and return to his cell or an authorized place), and he was so informed at the outset.  Ellison was of calm demeanor, understood why Flanagan was there and voluntarily agreed to answer questions about the Concord robberies.  The duration of the interview was comparatively short and the tone was conversational.  In short, there was no added imposition on his freedom of movement associated with the

interview, beyond the normal conditions of confinement he was already experiencing.  Indeed, his freedom of movement was somewhat expanded in that the library was a less imposing and less restrictive setting than he would otherwise experience in the general prison population, or in his cell.  Ellison was not subjected to any measure of compulsion above and beyond the mere fact of his imprisonment for unrelated reasons.

Ellison's claim that the simple fact of his incarceration during the interview renders any interrogation by police "custodial," is incorrect.  The totality of the circumstances determines whether a person already incarcerated is "in custody" for purposes of Miranda, and under these circumstances, Ellison was not "in custody."  See United States v. Menzer, 29 F.3d 1223, 1230 (7th Cir. 1994); United States v. Willoughby, 860 F.2d 15, 23 (2d Cir. 1988); Leviston v. Black, 843 F.2d 302, 303 (8th Cir. 1988); United States v. Conley, 779 F.2d 970, 972 (4th Cir. 1985); Cervantes v. Walker, 589 F.2d 424 (9th Cir. 1978).  Accordingly, the Miranda warnings were not required, as Ellison was not "in custody" for Miranda purposes.  His statements are not subject to suppression on grounds of presumptive involuntariness, due to Flanagan's failure to advise him of those rights and to obtain a waiver.

I credit Detective Flanagan's testimony, and do not credit Ellison's, in finding that neither Flanagan nor Plourde promised Ellison that he would never be charged with the Concord robberies, as an inducement to answer their questions.  While it is possible that such promises were made, or implied, I find Flanagan's account to be more credible — that Ellison was only told that his information (cooperation) would be brought to the attention of the prosecutor and that the prosecutor would determine what benefit might be extended as a result.

Even if Ellison was tricked, in that he was led to believe that he would not be charged with the Concord robberies, it is relatively rare for such trickery to sink to the level of coercion, rendering the elicited statements involuntary.  See United States v. Flemmi, 225 F.3d 78, 91 n.5 (1st Cir. 2000). The critical issue with respect to this suppression motion, with regard to a general coercion claim, is whether the government has met its burden to prove that, under the totality of the circumstances, defendant's statements to Flanagan and Plourde were the product of a free and deliberate choice, rather than the product of coercive official tactics.  See Moran v. Burbine, 475 U.S. 412, 421 (1986); see also Colorado v. Connelly, 479 U.S. 157, 167 (1986); United States v. Jackson, 918 F.2d 236, 242 (1st

Cir. 1990); Bryant v. Vose, 785 F.2d 364, 367-68 (1st Cir. 1986). I find that the government met that burden.

Only confessions procured by coercive official tactics are excluded as involuntary. United States v. Byram, 145 F.3d 405, 407 (1st Cir. 1998); Flemmi, 225 F.3d at 91. "[S]ome types of police trickery can entail coercion:  consider a confession obtained because the police falsely threatened to take a suspect's child away from her if she did not cooperate." Byram, 145 F.3d at 408 (citing Lynumn v. Illinois, 372 U.S. 528, 534 (1963) (police threatened removal of defendant's children if she did not cooperate)).  But, as noted by the Court of Appeals for the First Circuit in Byram, "[g]iven the narrowed definition of coercion in Connelly, it would be very hard to treat as coercion a false assurance to a suspect that he was not in danger of prosecution." Id.  Ellison's statements were voluntary, even if he was led to believe that he was not in danger of prosecution for the robberies under investigation.

With regard to defendant's claim that he demanded to speak with legal counsel before talking to the officers ("at least five times"), I do not find that testimony credible.  While there probably was some discussion of counsel, and while the officers

probably did brush aside or avoid the subject, the fact remains that Ellison was not subjected to a custodial interrogation, so the police officers were not required to cease questioning upon his request for counsel, unless Ellison initiated further communication, exchanges, or conversation, or unless counsel was first provided.  See Edwards v. Arizona, 451 U.S. 477 (1981).

Finally, Ellison, unpersuasively argues for suppression on grounds that the interviewing police officers (or jail officials) breached a duty to preserve videotape evidence of the interview generated by a security camera.  Defense counsel determined that the interview was likely recorded by a security camera, but only a video, not an audio, record would have been made.  Counsel also noted that the tape or digital medium was written over every forty days or so, and so was no longer available.  The re-use of the video medium appears to have been a routine practice of the jail — done according to a uniform procedure, generally applicable, and not directed at this defendant.  Moreover, there is no reason to think the video alone, without an audio recording, would have disclosed anything helpful to the defendant.  In any case, the record does not support a finding of bad faith destruction of any exculpatory evidence by either jail officials or Detectives Flanagan and Plourde.

### Conclusion

Ellison's statements, made during the noncustodial interview were voluntary and uncoerced.  The motion to suppress (document no. 10) is denied in all respects.


**SO ORDERED.**

_____
Steven J. McAuliffe
Chief Judge

March 28, 2008

cc:  Donald A. Feith, AUSA
     Michael R. Smith, Esq.
     U.S. Probation
     U.S. Marshal